UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| OBAYDULLAH, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil Case No. 08-1173 (RJL) |
| | ) |
| BARACK H. OBAMA,[1] *et al.*, | ) |
| | ) |
| Respondents. | ) |

MEMORANDUM ORDER
(October /9, 2010)

Petitioner Obaydullah ("petitioner" or "Obaydullah") is an Afghan detainee being held at the U.S. Naval Base at Guantanamo Bay, Cuba. He alleges that he is being unlawfully detained by Respondents President Barack H. Obama and Secretary of Defense Robert M. Gates (collectively, "respondents" or the "Government"). On September 30, 2010, this Court commenced habeas corpus proceedings for Obaydullah. That morning, counsel for both parties made unclassified opening statements in a public hearing. Petitioner Obaydullah listened to a live translation of the opening statements via a telephone transmission to Guantanamo Bay, Cuba.

Thereafter, the Court went into a closed-door session to hear each side present an opening statement that included relevant classified information. Upon completion of

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor. Accordingly, the Court substitutes Barack H. Obama for George W. Bush.

these statements, each side presented its evidence, most of which included classified material, and arguments regarding various material issues of fact in dispute by the parties. Because those presentations were not completed by the end of the day on September 30, 2010, this Court reconvened the following day. After it heard each side's closing arguments, the Court informed the parties that it would hold a public hearing in the near future to announce its decision. A classified version of this opinion setting forth in greater detail the factual basis of the Court's ruling will be distributed in the upcoming weeks through the Court Security Office, together with the final judgment.

Before stating the Court's ruling, a brief statement of the relevant factual and procedural background of this case is appropriate.

## BACKGROUND

Petitioner Obaydullah, an approximately 27-year old Afghan citizen, grew up in the small village of Milani in the Khost province near the Pakistan border. On July 21, 2002, U.S. forces, acting on tips from various intelligence sources, conducted a nighttime raid at the petitioner's home. During that raid, U.S. forces secured from his person a notebook containing certain diagrams that appeared to be wiring designs for building lethal improvised explosive devices ("IEDs"). In addition, U.S. forces found a stash of 23 anti-tank mines buried in an outdoor pit close to petitioner's home. Petitioner was, of course, taken into custody and transported to Champman Airfield for follow-up questioning. Shortly thereafter, he was transferred to Bagram Airfield where he was

imprisoned for approximately three months before being transported to the U.S. Naval Base in Guantanamo Bay, Cuba in October 2002.

In the aftermath of the Supreme Court's decision in *Boumediene v. Bush*, 553 U.S. 723 (2008), which held that Guantanamo detainees are "entitled to the privilege of habeas corpus to challenge the legality of their detentions," (*id.* at 771), Obaydullah filed his habeas corpus petition with this Court on July 7, 2008. (Pet. for Writ of Habeas Corpus [Dkt. #1].) Three days later, this Court held the first of two meetings with counsel in Obaydullah's case to discuss issues unique to his case and procedural issues attendant to the habeas process. On July 30, 2008, I ordered respondents to file their Factual Return for petitioner Obaydullah by October 24, 2008. (Briefing and Scheduling Order, July 30, 2008 [Dkt. #9].) On September 9, 2008, respondents sought a thirty-day extension for the production of the Obaydullah Factual Return. (Mot. for Partial Relief, Sept. 9, 2008 [Dkt. #26].) I granted respondents' motion on September 23, 2008, setting a new deadline of November 21, 2008 for the filing of the Factual Return. (Order, Sept. 23, 2008 [Dkt. #28].) That same month, charges were sworn against Obaydullah for conspiring to cause serious bodily injury, murder, and to provide material support to terrorism, as well as providing material support for terrorism, both crimes triable before a military commission. (Mot. to Dismiss or Alternatively, to Hold Petition in Abeyance, Nov. 12, 2008 [Dkt. #33].)

On November 12, 2008, the Government moved to dismiss or stay the proceedings pending Obaydullah's trial by military commission. (*Id.*) On November 21, 2008, I

stayed the deadline for filing of the Factual Return pending receipt of petitioner's response to the Government's motion or resolution of the motion. On November 26, 2008, petitioner notified the Court that it *agreed* that Obaydullah's habeas petition be held in abeyance pending completion of the military commission proceedings. Accordingly, the Court stayed this matter on December 2, 2008.

On January 20, 2009, the Obama Administration took office, and shortly thereafter issued a 120-day stay of all pending military commission proceedings. Accordingly, on February 24, 2009, Obaydullah moved to vacate the stay of his habeas petition. (Motion to Vacate Existing Stay, Feb. 24, 2009 [Dkt. #37].) The Government, not surprisingly, opposed his motion. On April 22, 2009, the Court denied petitioner's motion but ordered the Government to submit a status report on the military commission process as it applied to Obaydullah on July 17, 2009. On July 9, 2009, petitioner filed a second motion to vacate the stay. (Renewed Motion to Vacate the Existing Stay, July 9, 2009 [Dkt. #52].) On July 17, 2009, the Government filed the required status report notifying the Court that the Review Panel had not yet reached a decision whether to transfer the petitioner or try him before a military commission, even though at that point nearly six months had elapsed since the Administration had taken office. (Respondents' Status Report, July 17, 2009 [Dkt. #53].) Nevertheless, in deference to the Administration's continued analysis, I denied the petitioner's Renewed Motion to Vacate the Existing Stay on August 6, 2009. The petitioner appealed my decision to our Court of Appeals on September 10, 2009. (Notice of Appeal, Sept. 10, 2009 [Dkt. #58].) In its brief on appeal, the Government

4

reported that its review of Obaydullah's detention had been completed and that the Attorney General had determined that the petitioner's case was appropriate for prosecution before a military commission. The convening authority for such trials, however, had not then and still has not actually referred his case to a military commission for trial.

In any event, on June 18, 2010, our Circuit Court reversed my denial of the petitioner's motion to vacate and remanded the case for proceedings on Obaydullah's habeas petition. *Obaydullah v. Obama*, No. 09-5328 (D.C. Cir. June 18, 2010). The Circuit Court, in essence, concluded that, notwithstanding the fact that the petitioner had agreed to the original 90-day stay of his proceedings and the Attorney General had concluded that he should be tried before a military commission, it was inconsistent with the *Boumediene* Court's holding to delay his habeas proceedings any further. Accordingly, on June 28, 2010, two days *before* the Circuit Court's mandate issued, I met with counsel and ordered the respondents to file their Factual Return by July 26, 2010. In addition, I set a status conference for August 4, 2010 to discuss any issues raised after reviewing the Factual Return. The Government met its deadline and filed the Factual Return on July 26, 2010. (Notice of Filing—Respondents' Factual Return, July 26, 2010 [Dkt. #76].)

On August 4, 2010, the Court issued its Case Management Order (CMO) for the case. (CMO [Dkt. #77].) That order was essentially identical to the CMO I had issued on August 27, 2008 in *Boumediene v. Bush*, No. 04-cv-1166, and that I had used in the

six other habeas merits hearings I held in the eight months that followed. That same day, I also held a status conference with the parties to review those same procedures.

On August 19, 2010, the Government served an unclassified version of its Factual Return on petitioner's counsel. (Notice of Service of Unclassified Factual Return, Aug. 19, 2010 [Dkt. #86].) Petitioner's counsel had filed a motion to compel discovery the preceding day. (Notice of Filing—Motion to Compel Discovery, Aug. 17, 2010 [Dkt. #85].) Two days later, on August 20, 2010, I held a discovery hearing, and ultimately denied petitioner's motion on August 30, 2010. (Memorandum Order, Aug. 30, 2010 [Dkt. #88].)

On September 20, 2010, after a short extension of time that the petitioner had requested, Obaydullah filed his Traverse setting forth the factual basis for his opposition to the Government's Return. (Notice of Filing Petitioner's Traverse, Sept. 20, 2010 [Dkt. #92].) The Government filed its Reply on September 24, 2010. (Notice of Filing Reply to Petitioner's Traverse, Sept. 24, 2010 [Dkt. #94].) On September 27, 2010, this Court held a closed pre-hearing conference with the parties in an effort to narrow the issues to be covered in the habeas merits hearing. Petitioner Obaydullah supplemented the exhibits to his Traverse on September 29, 2010. (Notice of Filing of Petitioner's Supplemental Exhibits in Support of his Traverse, Sept. 29, 2010 [Dkt. #98].)

Based on a careful review of the Factual Return and the Traverse, and after a day and a half of hearings on the factual issues in dispute and the oral arguments of the parties, the following is the Court's ruling on Obaydullah's petition.

## LEGAL STANDARD

Under the CMO, the Government bears the burden of proving the lawfulness of the petitioner's detention by a preponderance of the evidence. (CMO ¶ II.A.) The Government contends that petitioner Obaydullah is being lawfully detained pursuant to the Authorization for Use of Military Force ("AUMF").[2] Specifically, the Government initially argued that petitioner Obaydullah was being lawfully detained because he is an "enemy combatant" who could be held pursuant to the AUMF. (Status Report, July 18, 2008 [Dkt. #7].) In that regard, the following definition of "enemy combatant" was previously adopted by this Court in the *Boumediene* cases, and used in six subsequent habeas merits hearings, to delineate those who could be lawfully detained:

> An "enemy combatant" is an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

*Boumediene v. Bush*, 583 F. Supp. 2d 133, 135 (D.D.C. 2008). In the aftermath of the change in administrations in January 2009, however, the Government, for reasons not

---

[2] In response to the September 11th terrorist attacks, Congress passed a joint resolution authorizing the President to:

> [U]se all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Authorization for Use of Military Force, Pub. L. No. 107-40, §§ 1-2, 115 Stat. 224 (Sept. 18, 2001).

7

known to this Court, now eschews the use of the phrase "enemy combatant" and simply argues instead that petitioner Obaydullah is the type of individual that is detainable under the AUMF. In fact, they go so far as to advocate that this Court adopt an even higher standard regarding the "supporting Taliban or al Qaeda forces" portion of this Court's previously-employed definition of enemy combatant, by requiring a showing of "substantial support" to the Taliban or al Qaeda, notwithstanding the fact that the standard applied by this Court in the *Boumediene* hearings and the six other merits hearings thereafter was upheld by our Circuit Court earlier this year in *Al Bihani v. Obama*, 590 F. 3d 866 (D.C. Cir. 2010). Fortunately, choosing between these standards is not necessary to a ruling on the petition in this case.

## ANALYSIS

The Government contends that Obaydullah was a member of an Al Qaeda "bomb cell" operating in the Khost region of Afghanistan at the time he was taken into custody by U.S. forces in 2002. In particular, the Government contends that petitioner: (1) was hiding on his property a cache of 23 anti-tank mines and seven plastic mine shells from which explosives had been removed; (2) was captured in possession of a notebook containing instructions and wiring diagrams for how to build a remote-control detonating device (i.e., IED); (3) was storing an automobile that contained dried blood and Taliban propaganda, and that had been used by him and another to ferry to a local hospital certain bomb cell members who had been injured in an accidental explosion; and (4) has repeatedly given false and implausible explanations regarding his knowledge of, and

involvement with, these explosives, this notebook, and this automobile. In short, the Government contends that its pre-raid intelligence sources linking Obaydullah to the bomb cell have been more than adequately corroborated and that it is therefore more likely than not that petitioner was indeed a member of that al Qaeda cell.

Petitioner, not surprisingly, disagrees. He denies any ownership interest in the mines and automobile recovered from his property. Moreover, he claims that the notebook contains nothing more than his notes from a bomb detection class he had been required by the Taliban to attend some eight months earlier, as well as notes from his business. In essence, he claims that the unidentified sources of the Government's pre-raid intelligence have falsely accused him of membership in this supposed al Qaeda bomb cell. Upon reviewing the return, the traverse, and oral arguments during the merits hearing, I disagree with the petitioner's contention and conclude for the following reasons that the Government has more than adequately established that it is more likely than not that the petitioner was in fact a member of an al Qaeda bomb cell, and therefore detainable under the AUMF.

The government's pre-raid intelligence indicated that Obaydullah was a member of an al Qaeda bomb cell who had anti-tank mines hidden in his compound. Although the pre-raid intelligence did not specify the exact location where the mines were being stashed, they did indicate that they were located somewhere within the walls of petitioner's compound. During the raid, U.S. forces located a pit some three feet beneath the surface of the land about 30 meters from the compound, where they found 23 anti-

9

tank mines.  When confronted with what was found, detainee, by his own admission, lied, claiming that he was holding onto the mines for his business partner and friend, Karim Bostan.  Obaydullah later changed his story on a number of occasions regarding his involvement with, and interest in, these mines.  His initial reconfiguration of the events was that the mines had been left behind at his home more than ten years earlier by a Soviet commander who had used Obaydullah's compound as an operations base.  He claimed that he and his mother and uncle buried the discarded mines some 300 meters from his compound.  Over the course of time he changed his story as to who had left the mines behind, when they were buried, and which family member actually buried these mines with him (i.e., petitioner buried the mines with just his uncle, by himself, and with just his mother).  Petitioner now even questions whether the mines uncovered by the U.S. forces are the same mines he recalls burying, but even if they are, continues to contend that he did not intend to use anti-tank mines to build IEDs for use against U.S. and Allied forces.

More specifically with respect to the mines, however, petitioner's traverse contends, *inter alia*, that a number of inaccuracies in the pre-raid intelligence's description regarding the mines and their location, are sufficient evidence to undercut the overall credibility of the sources of the pre-raid intelligence linking him to al Qaeda.  I disagree.

The details Obaydullah focuses on are—for the most part—of insufficient importance in the grand scheme of the events.  For example, whether the number of

10

mines was 18 or 23, whether the location of the mines was within the four walls of the compound as opposed to 30 meters away, and whether the mines were properly characterized as being of Italian, Soviet, or Pakistani origin are of little to no moment. What matters is that there were, in fact, 23 anti-tank mines of Italian and Pakistani origin that were found in close proximity to the petitioner's compound. And while the parties may quibble over issues relating to how the mines were buried and by whom, the fact is that Obaydullah lied about his interest in them when first confronted and then came up with a series of inconsistent and inherently ridiculous accounts as to their storage. Indeed, if, as he now claims, the mines the U.S. forces found were *not* the same ones allegedly discarded by the Soviets (or, in an alternate version of petitioner's account, by jihad fighters) that he purportedly buried with various family members, why did he not direct the U.S. forces to the supposed location 300 meters away? But even more importantly, if petitioner really had no ongoing interest in these mines, what on earth was he doing with a notebook *on his person* that spelled out in detail how to assemble those mines into remote control detonated IEDs?

Indeed, when confronted with the notebook, petitioner again—by his own admission—lied by telling the soldiers that the notebook contained notes and diagrams regarding, of all things, a power generator. Over the months and years since, petitioner's story as to the notebook and its contents has, not surprisingly, evolved to his current account that they were his notes from a Taliban-required class he attended months earlier on bomb detection. This story—yet again—defies both common sense and reality. In

fact, the Government's uncontroverted analysis of the notebook's contents clearly indicates that it contains wiring diagrams and notes that constitute a veritable checklist—in albeit somewhat cryptic form—of how to assemble a remote-control detonated IED. Thus, if there were any lingering doubt about petitioner's interest in the landmines unearthed on his property prior to the notebook's analysis, when viewed in combination with the notebook, there can be little doubt about the accuracy of the pre-raid intelligence of petitioner's interest in, and intent to use, these explosives against U.S. and Allied forces.

Finally, it is worth commenting briefly on the automobile found at petitioner's compound and petitioner's uncontroverted relationship with Karim Bostan. As to the former, the Government introduced intelligence indicating that the petitioner and Karim Bostan, in the aftermath of an accidental explosion, were seen driving an automobile taking several wounded bomb cell members to a local hospital for medical attention. The U.S. forces that conducted the raid of petitioner's compound seized an automobile, and the Special Forces sergeant who helped conduct the raid later indicated that it had contained both evidence of dried blood and certain pro-Taliban propaganda. While petitioner denies any ownership interest in such a car, the legal title to the vehicle is of no consequence in this situation. By contrast, what matters here is that the automobile found in the petitioner's compound that night contained the residue of dried blood, a fact that is consistent with the pre-raid intelligence claim that petitioner was seen using a vehicle to

ferry wounded individuals to a local hospital, once again corroborating the government's intelligence.

As for the petitioner's relationship to Karim Bostan, I would, of course, be remiss to unnecessarily plunge head-first into an analysis of Bostan's alleged ties to al Qaeda as chronicled at length by former Guantanamo detainee Adel Al Zamel (ISN 568). Indeed, unraveling the considerable evidence regarding Al Zamel's credibility—at this point—would be a major project that no court would likely undertake unless absolutely necessary. Fortunately, in this case, it is not. It is sufficient to note that the petitioner had a long-standing relationship of both a business and personal nature with Karim Bostan. That relationship included their involvement in a religious organization called Jamaat al-Tabligh. Indeed, their relationship was sufficiently close that on the evening of the raid by U.S. forces Obaydullah claimed to be holding the mines found on his property for Bostan. Thereafter, Bostan engaged in certain conduct that, although not describable in this opinion, is consistent with the impression of their relationship portrayed by this unclassified evidence.

Not surprisingly, perhaps, petitioner began backing away from these and other stories involving Bostan when Bostan later showed up as a fellow detainee at the Guantanamo facility. However, the combination of the explosives, the notebook instructions and the automobile with dried blood all fit together to corroborate the intelligence sources placing both the petitioner and Bostan at the scene aiding fellow bomb cell members who had been accidentally injured while constructing an IED. Thus,

combining all of this evidence and corroborated intelligence, the mosaic that emerges unmistakably supports the conclusion that it is more likely than not that petitioner Obaydullah was in fact a member of an al Qaeda bomb cell committed to the destruction of U.S. and Allied forces. As such, he is lawfully detainable under the AUMF and this Court must, and will, therefore DENY his petition for a writ of habeas corpus.

## CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in the forthcoming classified version of this opinion, it is hereby

**ORDERED** that petitioner Obaydullah's petition for a writ of habeas corpus is **DENIED**.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge