~~SECRET~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE:

OBAYDULLAH, )
)
Petitioner, )
)
v. ) Civil Case No. 08-1173 (RJL)
)
BARACK H. OBAMA,[1] et al., )
)
Respondents. )

## CLASSIFIED MEMORANDUM OPINION
(November 24, 2010)

For the reasons set forth on the record at the public hearing held on October 19, 2010, and for the following reasons, the Court DENIES Obaydullah's petition for a writ of habeas corpus.

## ANALYSIS

Petitioner Obaydullah, an approximately 27-year old Afghan citizen, grew up in the small village of Milani in the Khost province near the Pakistan border. On July 21, 2002, U.S. forces, acting on tips from various intelligence sources, conducted a nighttime raid at the petitioner's home. During that raid, U.S. forces secured from his person a notebook containing certain diagrams that appeared to be wiring designs for building

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor. Accordingly, the Court substitutes Barack H. Obama for George W. Bush.

~~SECRET~~

~~SECRET~~

lethal improvised explosive devices ("IEDs"). In addition, U.S. forces found a stash of 23 anti-tank mines buried in an outdoor pit close to petitioner's home. Petitioner was, of course, taken into custody and transported to Champman Airfield for follow-up questioning. Shortly thereafter, he was transferred to Bagram Airfield where he was imprisoned for approximately three months before being transported to the U.S. Naval Base in Guantanamo Bay, Cuba in October 2002.

## ANALYSIS

The Government argues that Obaydullah is the type of individual who is detainable under the Authorization for Use of Military Force ("AUMF")—or, in other words, is an enemy combatant—because he was "part of" an Al Qaeda "bomb cell" operating in the Khost region of Afghanistan at the time he was taken into custody by U.S. forces in 2002. (Return ¶1 at 1.) In particular, the Government contends that petitioner: (1) was hiding on his property a cache of 23 anti-tank mines and seven plastic mine shells from which explosives had been removed; (2) was captured in possession of a notebook containing instructions and wiring diagrams for how to build a remote-control detonating device (i.e., IED); (3) was storing an automobile that contained dried blood and Taliban propaganda, and that had been used by him and another to ferry to a local hospital certain bomb cell members who had been injured in an accidental explosion; and (4) has repeatedly given false and implausible explanations regarding his knowledge of, and involvement with, these explosives, this notebook, and this automobile. In short, the

2
~~SECRET~~

~~SECRET~~

Government contends that its pre-raid intelligence sources linking Obaydullah to the bomb cell have been more than adequately corroborated and that it is therefore more likely than not that petitioner was indeed a member of that al Qaeda cell.

Petitioner, not surprisingly, disagrees. He denies any ownership interest in the mines and automobile recovered from his property. (Classified Opening 16:12-18:2, 18:4-23.) Moreover, he claims that the notebook contains nothing more than his notes from a bomb detection training he had been required to attend by the Taliban some eight months earlier, as well as notes from his business. (Traverse 5-6.) In essence, he claims that either the Government's pre-raid intelligence has not been adequately corroborated, or that the unidentified sources of the Government's pre-raid intelligence have falsely accused him of membership in this supposed al Qaeda bomb cell. (Classified Opening 20: 4-18; 21:4-10.) Upon reviewing the return, the traverse, and oral arguments of counsel during the merits hearing, I disagree with the petitioner's contention and conclude for the following reasons that the Government has more than adequately established that it is more likely than not that the petitioner was in fact a member of an al Qaeda bomb cell, and is therefore detainable under the AUMF.

1. **The pre-raid intelligence.**

The Government's case in large part rests on the pre-raid intelligence reports that link Obaydullah to an al Qaeda bomb cell. However, the Government has not disclosed the source of the pre-raid intelligence. Though, as petitioner points out, raw intelligence

3
~~SECRET~~

~~SECRET~~

reports may not be sufficiently reliable, standing alone, to justify detention (Traverse 17-18), essentially, the government argues that its intelligence has been sufficiently corroborated to conclude that it is accurate, and thus, that it is more likely than not that Obaydullah was, in fact, a member of an al Qaeda bomb cell and is thus detainable under the AUMF. Accordingly, a short description of the information contained in that pre-raid intelligence is appropriate.



~~SECRET~~



## 2. The raid on Obaydullah's compound.

U.S. forces, acting on this intelligence, subsequently conducted a night-time raid on petitioner's compound on July 21, 2002.

During the raid,[1] ███ U.S. forces recovered 23 anti-tank mines of Italian and Pakistani origin, as well as seven empty mine shells, ███ from Obaydullah's compound. ███ U.S. forces also found a taxi

5
~~SECRET~~

~~SECRET~~

cab in the compound that was covered by a tarp and contained inside dried blood and Taliban propaganda. (Gov't Exs. 37, ▪ 110.) Indeed, the Special Forces Staff Sergeant who participated in the raid reported that the blood could have been connected to an earlier incident in which petitioner and Karim Bostan were seen by an intelligence source taking some individuals to the hospital after an accidental explosion that occurred during the construction of a mine-based IED. (Gov't Ex. 37.) Finally, U.S. forces recovered a notebook from Obaydullah's pocket. (Return ¶45 at 18-19; Gov't Ex. 110; *see also* Gov't Ex. 17.) That notebook contained information intended to assist in the construction of a remote-controlled IED that used a mine as its main charge. (Gov't Ex. 13.) Obaydullah, who then identified himself as "Baitullah," was taken into custody along with two of his cousins. (Gov't Ex. 110, Return ¶43 at 18).

### 3. Petitioner's explanations for his possession of the mines and the notebook.

At the scene, the petitioner, by his own admission, lied when confronted with the mines and the notebook. With respect to the mines, Obaydullah claimed that he was holding onto the mines for his business partner and friend, Karim, who he later identified to be Karim Bostan. (Gov't Ex. 37; Return ¶46 at 19.) With respect to the notebook, petitioner again lied by telling the soldiers that the notebook contained notes and diagrams regarding, of all things, a power generator. (Gov't Exs. 37, 110.) Petitioner also maintained that the notebook had been given to him by Karim. (Gov't Ex. 110.)

6
~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

Obaydullah now puts forth very different accounts of the mines as well as the notebook. For the following reasons, however, I find his current explanations for why he was in possession of anti-tank mines and a notebook of instructions on how to generate mine-detonated IEDs, not to be credible.

With respect to the mines, Obaydullah later changed his story on a number of occasions regarding his involvement with, and interest in, the mines. (Hearing Tr., Oct. 1, 2010 AM, 4:24-9:25, 11:10-14:21.) His initial reconfiguration of the events was that the mines had been left behind at his home more than ten years earlier by the Soviet commander Ali Jan, who had used Obaydullah's compound as an operations base. (*Id.* 8:9-15; Gov't Ex. 29.) However, he has also at times claimed that the mines were instead left by jihad fighters. (Gov't Ex. 30). He claimed that his mother and uncle buried the discarded mines some 300 meters from his compound. (Gov't Ex. 47.) However, at other times he claimed that he buried them himself (Gov't Exs. 30, 46), that just he and his uncle buried them (Gov't Ex. 107), or that just he and his mother buried them (Gov't Ex. 89). Petitioner has also changed his story as to when the mines were buried, at one time saying that they were buried approximately in 1992, ten years prior to his arrest (Gov't Ex. 47), yet also stating that they were buried approximately in 2001, just after Obaydullah's supposed conscripted attendance at a Taliban school (Gov't Ex. 107). Petitioner now even questions whether the mines uncovered by the U.S. forces are the same mines he recalls burying, but even if they are, continues to contend that he did not

7
~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

intend to use the anti-tank mines to build IEDs for use against U.S. and Allied forces. (Hearing Tr., Sept. 30, 2010 PM, 35:9-36:15; 61:5-6.)

More specifically with respect to the mines, however, petitioner contends, *inter alia*, that a number of inaccuracies in the pre-raid intelligence's description regarding the mines and their location, are sufficient evidence to undercut the overall credibility of the sources of the pre-raid intelligence linking him to al Qaeda. (Classified Opening 21:24-23:22.) For example, the pre-raid intelligence mentioned ▮▮▮ and that the mines were Soviet, not Pakistani or Italian (Classified Closing 31:19-20). Petitioner also points to other statements in the pre-raid intelligence linking him to al Qaeda to argue that it has not been sufficiently corroborated. I disagree.

The details Obaydullah focuses on are—for the most part—of insufficient importance in the grand scheme of the events. For example, whether the number of mines was 18 or 23 and whether the mines were properly characterized as being of Italian, Soviet, or Pakistani origin are of little to no moment. ▮▮▮

8
~~SECRET~~

~~SECRET~~

████████ What matters is that there were, in fact, 23 anti-tank mines of Italian and Pakistani origin that were found in close proximity to the petitioner's compound. And while the parties may quibble over issues relating to how the mines were buried and by whom, the fact is that Obaydullah lied about his interest in them when first confronted and then came up with a series of inconsistent and inherently ridiculous accounts as to their storage. Indeed, if, as he now claims, the mines the U.S. forces found were *not* the same ones allegedly discarded by the Soviets (or, in an alternate version of petitioner's account, by jihad fighters) that he purportedly buried with various family members, why did he not direct the U.S. forces to the supposed location 300 meters away? But even more importantly, if petitioner really had no ongoing interest in these mines, what on earth was he doing with a notebook *on his person* that spelled out in detail how to assemble those mines into remote-control detonated IEDs?

Petitioner's story as to the notebook has also, not surprisingly, evolved to his current account that they were his notes from a Taliban-required class he attended months earlier on bomb detection. This story—yet again—defies both common sense and reality. In fact, the Government's *uncontroverted* analysis of the notebook's contents clearly indicates that it contains wiring diagrams and notes that constitute a veritable checklist—in albeit somewhat cryptic form—of how to assemble a remote-control detonated IED. Thus, if there were any lingering doubt about petitioner's interest in the landmines unearthed on his property prior to the notebook's analysis, when viewed in combination

~~SECRET~~

with the notebook, there can be little doubt about the accuracy of the pre-raid intelligence of petitioner's interest in, and intent to use, these explosives against U.S. and Allied forces.

### 4. Taxi recovered during raid.

It is worth commenting briefly on the automobile found at petitioner's compound. The Special Forces Staff Sergeant ("the Staff Sergeant") who participated in the raid submitted a declaration indicating that the petitioner and Karim Bostan, in the aftermath of an accidental explosion, were seen driving an automobile taking several wounded bomb cell members to a local hospital for medical attention. (Gov't Exs. 37, 110.) He also stated that the U.S. forces seized a taxi from petitioner's compound, and that that automobile had contained both evidence of dried blood and certain pro-Taliban propaganda. (*Id.*; ███████████)

Petitioner denies that any such car existed by pointing to the post-raid report that does not mention the contents of the automobile seized, the lack of physical evidence of the blood in the car, and questions the veracity of the Staff Sergeant's declaration, which was submitted four years after the raid. (Hearing Tr. Sept. 30, 2010 PM, 40:10-17; 41:4-7.) However, other than the arguments of counsel, there is nothing to indicate that the Staff Sergeant had, or would have, falsified his sworn statements to the Court. Moreover, the Staff Sergeant noted in his 2010 declaration that this automobile was found underneath a tarp, ████████████████████████████████

10
~~SECRET~~

~~SECRET~~

███████████████████████ Accordingly, I find no reason to distrust the statements made by the Staff Sergeant regarding the discovery of the taxi and its contents, including the residue of dried blood. This fact, of course, is consistent with the pre-raid intelligence claim that petitioner was seen using a vehicle to ferry wounded individuals to a local hospital, once again corroborating the government's intelligence.

### 5. Petitioner's relationship with Karim Bostan

Finally, as for the petitioner's relationship to Karim Bostan, I would, of course, be remiss to unnecessarily plunge head-first into an analysis of Bostan's alleged ties to al Qaeda as chronicled at length by former Guantanamo detainee Adel Al Zamel (ISN 568). Indeed, unraveling the considerable evidence regarding Al Zamel's credibility—at this point—would be a major project that no court would likely undertake unless absolutely necessary. Fortunately, in this case, it is not.

Notwithstanding Al Zamel's accounts, it is well-established that petitioner had a long-standing relationship of both a business and personal nature with Karim Bostan. Bostan is also an Afghan citizen from the Khowst region who was Obaydullah's business partner. (Gov't Exs. 22, 29, 31.) The two were also both members of a religious organization called Jamaat al-Tabligh, which, though officially apolitical, has been used as a cover by members of some terrorist groups, including al Qaeda. (Hearing Tr., Sept. 30, 2010 PM, 59:11-12; Gov't Exs. 29, 24, 45, 64.) Indeed, petitioner and Bostan's relationship was sufficiently close that on the evening of the raid by U.S. forces

11
~~SECRET~~

~~SECRET~~

Obaydullah claimed to be holding the mines found on his property for Bostan. (Gov't Ex. 37.)



Not surprisingly, perhaps, petitioner began backing away from these and other stories involving Bostan when Bostan later showed up as a fellow detainee at the Guantanamo facility. However, the combination of the explosives, the notebook instructions and the automobile with dried blood all fit together to corroborate the intelligence sources placing both the petitioner and Bostan at the scene aiding fellow bomb cell members who had been accidentally injured while constructing an IED. Additionally ▮▮▮▮ serve to further corroborate the credibility of the government's intelligence source linking Obaydullah to

12
~~SECRET~~

~~SECRET~~

the al Qaeda bomb cell. Thus, combining all of this evidence and corroborated intelligence, the mosaic that emerges unmistakably supports the conclusion that it is more likely than not that petitioner Obaydullah was in fact a member of an al Qaeda bomb cell committed to the destruction of U.S. and Allied forces. As such, he is being lawfully detained under the AUMF and this Court must, and will, therefore DENY his petition for a writ of habeas corpus.

## CONCLUSION

Thus, for all of the foregoing reasons, and those set forth at the hearing on October 19, 2010, the Court DENIES Obaydullah's petition for a writ of habeas corpus.

/s/
---
RICHARD J. LEON
United States District Judge